Case No. 14-1244-L, Public Citizen, Inc., Petitioner v. Federal Energy Regulatory Commission Mr. Nelson for Petitioner, Public Citizen Mr. Wright for Petitioner, State of Connecticut Mr. Solomon for the Respondent And Mr. Mezzina for the Intervenor Mr. Mezzina for the Intervenor I'm Scott Nelson representing the Petitioner, Public Citizen. I've asked to reserve three minutes for rebuttal. We'll see how that goes. There's no question in this case that if a majority of the Federal Energy Regulatory Commission were to decline to set the lawfulness of a rate for a hearing on the ground that the Commission lacked authority to consider whether it was unjust and unreasonable, this Court would have jurisdiction to review that action and would set it aside as contrary to law. The question this case poses is whether a different result is required because in this case the Commission took that action as a result of a 2-2 deadlock. Go ahead. You said the Commission took that action, but the record says they didn't take that action. It happened as an operation of law, right? Well, I mean, the question about operation of law, this Court held in the Amador County case that there are circumstances where if an agency, by allowing something to happen by operation of law, there are circumstances where that will be considered reviewable action. But Amador County was IGRA, and there was some different language involved there, right? Well, the language in Amador County was it takes effect by operation of law to the extent consistent with law. In this case, it's undisputed that the rate is still subject to the requirement in Section 205  It only takes effect to the extent that it is consistent with that requirement. So that would be—I'm sorry. No, go ahead. That backdrop would be equally true in a situation in which the Commission didn't do anything and there were no statements issued and the rate goes into effect by operation of law. In which event, if there's no statements issued at all and the Commission just doesn't do anything, would there be judicial review? Well, I think in that case, the difficulty would be whether there was a basis for review. In this case, we have the benefit of the Commissioner's explanations of their reasons. Right, but so when you say the difficulty would be would there be review or not, because you can hypothesize a situation in which the Commission just stays its hand, doesn't do anything, just like it did in this case, and then issues the same notice that says, you know, because the Commission took no action, the rates took effect by operation of law, and then the Commissioners don't themselves issue statements. Yeah, well, the one comparable case that I'm aware of that has ever been before this Court is a case called Democratic Congressional Campaign Committee v. FEC, Federal Election Commission. In that case, what happened was the Federal Election Commission, as a result of a deadlock, was required to dismiss an enforcement action. And what Judge Ginsburg held in that case is that in those circumstances, because it was a reviewable action, in order to facilitate review, the Court would order the Commissioners to provide a statement of their reasons. That would then serve as the basis for review. And in that context, I mean, it's the one context I'm aware of where the Court regularly is presented with, because of the nature of that particular agency, it's regularly presented with actions that are the result of deadlocks, and it regularly reviews the statements of reasons of the Commissioners whose votes blocked the Commission from taking action as the agency rationale under the Chenery Principle. So if that were to happen here, you know, it's conceivable that the Court could order the Commissioners to supply reasons to allow review where their action has resulted in a rate-taking effect that is subject to the requirement that rates be just and reasonable. So there can certainly be some situations, I assume, in which the rate takes effect by operation of law because of Commission inaction and there is no review? Or do you think there's no such situation? Well, that typically happens to the extent that it happens typically, and Commissioner Moeller explains that it's actually a very unusual circumstance for a rate ever to take effect without an affirmative action of the Commission. But, you know, if that were to happen in circumstances where nobody had intervened to protest the rate, obviously there would be no occasion for review. Even though there's still the just and reasonable standard in the background? Right. But, you know, there are requirements in order to obtain review that a person has to have participated in proceedings before the Commission and has to have sought rehearing. So if you didn't go in to contest the 205 rate filing, then, you know, you're stuck with 206 if you want a later complaint. Okay. So then is your view that any time somebody in the context of a 205 proceeding raises a challenge, that necessarily begets a reviewable inaction by the Commission? Yes, I think that's right. I mean, of course, you know, that action might not be successful in many instances if the Commissioners actually had good reason for not exercising their responsibility to ensure that the rate is just and reasonable before allowing it to go into effect. But in this case – Then there would be judicial review and that would be sustained. Right, right. So that's what – Right, yeah. Then one last question and then I'm sorry for cutting you off at the beginning. Well, these are the questions that are at the heart of the case. Well, good, we'll see if this one is. If these statements were issued not on Commission letterhead in the form of something written, but let's say the Commission has a blog and the Commissioners just issue a blog post and say, you know, the Commission issued a notice that was for purposes of public information and let everybody know that the rates went into effect by operation of law. But, you know, these blog posts are kind of for us to just amuse about the reasons that we might have taken action and they blog about it. And we can discern from the blogs that the breakdown is the same as what you deem to be in evidence because of the statements. Would we say that there's review because of what was stated in the blog post? Well, I think in that circumstance, number one, it wouldn't go to the court's jurisdiction to review. It would go to whether or not those statements, you know, were used to the status of being accepted by the court as the reasons for the action under Channery. And if they appeared to be just, you know, personal musings, I think the court might say, you know, we're not going to review it on that basis. But if they, you know, if it's an official Commission blog in which the Commissioners are acting as Commissioners in expressing their views on the blog, the court might well find that those suffice to review the action under Channery. But in either event, there would be review, actually. You think that regardless of, I mean, one might need further information from the Commission on how official the blog is, but your position would be that there's review regardless. Right. I mean, the court's jurisdiction depends on the nature of what the Commission did as a body, which in this case is to allow the rates to go into effect, and on its obligation, as this court recognized in Excel, its mandate to ensure that rates are just and reasonable before allowing them to go into effect. Now, in that case, you might say to the Commission, well, we're going to have to remand because we don't have an adequate basis to determine why you did what you did. In this case, you don't face that problem because you have very, you know, very formal statements that each of the Commissioners issued contemporaneously with the notice of what they had done, allowing this rate to go into effect. And the decisive vote, and I just want to get to this very quickly, Commissioner LaFleur stated that her reason for voting as she did was that the Commission had no authority under Section 205 to set aside a rate that resulted from an auction on the ground that that rate was not just and reasonable. And no one here, not the Commission, not the interveners, actually defends that rationale as a correct statement of the law. Now, if LaFleur had agreed with Mueller on the reasons, am I saying it right? Mueller. If LaFleur had agreed with Mueller and not espoused the rationale that she did in her statement, would there be review? There would be review. And the issue there would be was the explanation given for the lawfulness of the rates arbitrary and capricious? In other words, for the justness. If there was a finding by two Commissioners that the rates were just and reasonable, then you'd review that in the same way you review any Commission finding that a rate is just and reasonable. You have a deadlock. You still have a 2-2 deadlock. Right. But those would be the determinative votes, and they would state the rationale of the agency for letting that rule go into effect. Here, you have one of the determinative votes resting on what is a clear error of law, so you don't have to get to whether, for example, Mueller's statement might not be sufficiently explanatory to survive review under an arbitrary and capricious standard. It's very conclusory. But you don't really have to get to that because here we know that Commissioner LaFleur's vote rested on a proposition of law that's simply erroneous, that the Commission lacks the authority to determine that a rate resulting from an auction is unjust and unreasonable. Well, getting to the point of deciding the merits of her position, we have to decide that we have jurisdiction in the first place. And it seems like you're arguing that when there is information available about what the individual commissioners were thinking, that's enough to give us jurisdiction to review. And I just want to understand your argument here, and that you seem to be billing that on the basis of saying, well, it's analogous to the FEC case in which we have actually asked them to tell us why they made a certain decision. In other words, give us the information that allows us to review. But the reason the analogy is somewhat flawed here, it seems to me, is that in that case, the statute actually says the deadlock is reviewable. So what I want to ask you is, where is that in the FPA? A number of points. But to get to the last part of the question first, since that was the actual question, the statute in the case of the FEC doesn't say that a deadlock is reviewable.  And here, what the statute says is that an order is reviewable. An order, as this court has explained, is a generic term that's used in review statutes, meaning any action that is subject to review on the basis of an agency record. And the determination to allow a rate to go into effect and not to set its lawfulness for hearing is such an action. So the reason it's reviewable is not that we have the insights into what the commissioners were thinking here. That's the reason why the court, once it takes jurisdiction, can actually find a sufficient basis for reviewing and setting aside the order. But what makes it reviewable is that it's an action with legal effect. The commission has given it legal effect in subsequent action, subsequent orders, saying in a 206 proceeding later on, that we can't reopen this because of what we did in letting this rate go into effect under 205. Okay, but I want to get clear, you know, how you are seeing action. Because we have cases, and in particular, Sprint Nextel, where we said if it goes into effect by operation of law, that is not an action or an order of the agency. And the difference is that when the thing, I'll just say thing, that goes into effect by operation of law, in this case it's a rate, where it remains subject to a legal standard, such as the 205 legal standard that it must be just and reasonable, then Amador County says Sprint Nextel doesn't apply in that circumstance. In that circumstance, even though the rate goes into effect by operation of law, or that action takes effect because the statute says, there's also an underlying statutory command that the agency's action, whether it's passive in allowing it to go into effect or active, the agency's action has to meet that standard, and that's the just and reasonable standard here under 205. In Sprint v. Nextel, there was no such legal standard that the decision to forbear had to meet. But it still was an action that had legal effect. It did have legal effect. And so legal effect is part of the answer. I think it can't be all of the answer under Sprint Nextel. The other part of the answer under Sprint and Amador County is that the thing that goes into effect by operation of law is subject still to some governing legal standard that the agency must meet in letting that process. And I suppose the distinction that cuts in the other direction for Amador County is that I'm not aware in Amador County that there was another procedure whereby the same standard could be enforced, whereas here there is because there's a 206 procedure under which the just and reasonable standard can be enforced. Well, two points on that. The first is that since the 206 standard involves a flipping of the burden of proof, and in fact the imposition of a very stiff burden here because it would be subject to Mobile Sierra, that remedy is not an adequate alternative to the agency exercising its responsibility under 205 to hold the filer of the rate to the burden of showing its lawfulness. And I think that's the lesson of this Court's decisions in Batavia and in Excel that 206 can't be a backstop for the agency's failure to exercise its responsibility under 205. So wasn't that in the Supreme Court's decision in Southern Railway, which has to do with the ICC, it seemed like it was a similar statutory dynamic whereby there was one method of going through the procedure in which the burden was on one party, and then there was another method, I think it was a roughly similar standard, where the burden would flip, but the Supreme Court thought that the fact that the burden would flip didn't undermine the notion that there was no review vis-à-vis the first stage. Well, I think that's a case where there was not a basis for review of the first stage. Here there is a statutory review provision, and under Amador County the conditions for invoking that are met here because there is an action that is subject to review. All right. Thank you. Thank you. Thank you. Good morning. May it please the Court. I'm John Wright. I represent the Connecticut Office of the Attorney General. I'm allocated five minutes. I'd like to reserve one for rebuttal if I may. My colleague addressed the principal issues of reviewability, and I would like to address the next logical question of whether FERC's action, if reviewable, or failure to act in this case, is consistent with its obligations under the Federal Power Act and its obligations under the tariff that was the subject of the multi-party settlement agreement creating the forward capacity market. And FERC's actions are neither. In some respects, once we get past reviewability, this is a very simple case. It rests on three fundamental principles, which I think no party in this room will dispute today. The first, rates that reflect the exercise of market power create unnecessary and excessive costs for consumers. Second, rates that are therefore not just and reasonable. Rates that are not just and reasonable are unlawful. And third, that the FERC, the commission here, its primary and principal purpose is to protect consumers from rates that are excessive. And the case law for these propositions is uniform and consistent. If, as I will show you, the rates of interest in this case do show the influence and impact of market power and unmitigated market power, then the FERC has an obligation, a duty to act, a duty to mitigate, and to review those rates, to investigate them, certainly. In this case, FERC knew that the rates were subject to the exercise of market power, and yet it failed to act. And we believe this is an abdication of its responsibility and therefore an abuse of its discretion. The court recently concluded in the Accel Energy Services, when the commission has made the findings that the rates are unlawful, it must act. In this case, the only principal difference is that the FERC has made all the predicate findings and the administrative record clearly shows that market power was exercised by certain suppliers. And this court must therefore remand the matter back to the commission, not just to protect the consumers in this case, but to protect consumers to ensure that all of FERC's many market-based markets and FERC's actions in supporting those markets comport with their obligations under the Federal Power Act. Can I just ask you an informational question? Because it wasn't completely clear to me, but it appeared that FERC didn't ignore this. I mean, it did start an investigation. It did do some other things. It appears it has other tools than simply 205. So is it your position that that's not an adequate response? It has to be under 205? Yes. Principally under 205, they have to investigate the rates prior to their going into effect. They especially have to investigate the rates when there's not just a material issue of fact as to whether these rates are just and reasonable, but where there is overwhelming documented evidence that is presented in the record showing that participants in fact exercised their market authority and increased the rates above the levels that were just and reasonable. And we know that through several different avenues. First, when the ISO made its initial filing, it stated openly that the prices are the result of a noncompetitive auction. Second, immediately after the auction, the ISO did make a nonpublic referral to the Office of FERC Enforcement. I'm happy to give sites for any of that if you're... Concerning the bidding behavior of certain capacity importers. Now, these are a unique set of capacity suppliers, and if I can, in a little bit, I'll try and walk you through exactly what happened so we know exactly how the Commission did, the parties did, exercise the market power and manipulate the market. Now, while the referral was nonpublic, certain aspects of the new review of the tariff that FERC ordered ISO to do show exactly what happened. And ISO did, in response to the FERC's initial question, said, in a situation with limited excess supply, participants with large amounts of capacity and supply are likely to recognize that they can be pivotal and affect the auction prices. And I think just, if you let those words sink in, pivotal suppliers affected the market prices. And we know FERC understood that. The same day that it issued its order allowing the rates to go into effect, it also instituted a new Section 206 proceeding to remedy those loopholes in the tariff which allowed for the unlawful exercise of market power in the first place. And that juxtaposition of events left Commissioners Bay and Clark left only to describe it as ironic. I'd like to take a moment to explain how the tariff works. And the tariff has certain measures that it helps the Commission and the ISO to prevent manipulation by market power. Two of those. One is the review of auction bids by market participants in real time when they're happening. And the second is a set of administrative price rules. And those price rules are triggered when there's insufficient competition and everybody got set a clearing price. In this case, most of the participants got set a clearing price somewhat over $7. For complicated reasons, capacity imports are treated differently than other existing resources. They're treated such as new supply. And new supply has two critical reasons why they're treated differently that allow the capacity importers to exercise their market authority. The first, unlike existing resources, they were never subject to any review of their bids. To see if the bids were economic or to see if the bids were an intentional withholding of supply in order to exercise market power. All the other bidders would have gone through that process and had to submit their bid and get approved by the ISO. The second is, unlike the existing suppliers elsewhere, those capacity supporters get the actual market clearing price, even though the auction failed. Because they're treated like new resources, they would get a $15 clearing price and not the administratively set $7 clearing price. As a result, it was very clear to all of them at the time when they were able to remove a certain amount of capacity, large enough to flip the difference, all of those megawatts, 1,200 to 1,500 megawatts, and all of New England, Northeastern Massachusetts, all of Boston, were hit with much higher prices in the $15 range than had ever cleared in a capacity market before. We also know that those same capacity importers cleared the year before in the auction and the year after in the auction in the $3 range. The only reason that they were able to clear at $15 is because they were pivotal suppliers. And I can run through the math with anybody who's interested, but my math is about $360 million to those capacity importers alone and the Northeastern Massachusetts. I'm going over my time, and I'd love to talk longer, but I'll withdraw if you have any questions. All right, thank you. Thank you. May it please the Court, Robert Solomon for the Commission. I will start first with the issue of jurisdiction and the questions posed to Mr. Nelson and the points that he raised. It's imperative to keep in mind that the Commission, as a collegial institutional body, undertook no action, issued no order, made no decision, and has no record of agency decision-making. A public citizen asked this Court to go to the individual statements of individual commissioners, and of course, as we know from the case law, those statements speak only for that particular individual commissioner and do not speak for the Commission as an institutional body. Judge Brown, you are exactly correct. The Federal Elections Commission case cited by public citizens for the supposed proposition that you can somehow divine the agency's decision-making from individual statements does not speak to this particular case because, yes, the FEC statute does provide for judicial review when there is inaction because of a deadlock of the Federal Elections Commission. Of course, the FEC is designed to deadlock with an equal number of commissioners from each party, and the issue before the Court in that case was, if you have judicial review, how does the Court divine the decision-making of the agency? Do you look at the lawyer's brief? Do you look at the opinion of three of the commissioners who would have pursued an issue and a complaint? Do you look at the statement of the three commissioners who would not have pursued that particular complaint? That is not the case here with respect to the Federal Power Act. If, however, the Federal Power Act is amended to provide for judicial review in the event of agency inaction, we described in our brief on page 24 that there is a bill before Congress. It was H.R. 2984, the Fairer Rates Act, which has been passed by the House of Representatives. I do not believe the Senate has taken that bill up. In that circumstance, you would have the FEC circumstance where you have a judicially reviewable agency inaction, but you would have to try to figure out how to divine what the basis for the agency's decision was. Public citizen repeatedly refers to Commissioner LeFleur's individual statement as the decisive or the determinative basis for decision, but that speaks only for that particular commissioner's position. That statement speaks for only one of the four commissioners and does not speak for the commission itself. Suppose we have the same situation as this case and that the commission doesn't take an action, issues a notice exactly on all four of the notices issued in this case, and then each of the four commissioners releases a statement, all of them mapping onto Commissioner LeFleur's statement. I do not think that that would be the basis for judicial review or any basis for agency decision-making because it does not speak for the commission as an institutional collective body. The Public Service Commission of New York case from 1974, the Sprint Next Tell case from 2007 speak to that point. Your Honor, you raise the question as to whether it would make any difference if the separate statement or the individual view were articulated not in a notice or a press release but in an agency blog. And the answer would be it would not matter how that individual view is articulated. What matters is whether anything has been articulated on behalf of the agency as an institutional body. And we do believe that Sprint Next Tell, the 2007 decision, is the decision that is most directly on point, much more so than the Amador County decision. What's your response to Mr. Nelson's argument that this is more like Amador because you have this mandate for just and reasonable rates? Well, we, of course, respectfully disagree. And in that respect, again, the Sprint case is very similar to the case presented here. The Federal Power Act and the Telecom Act in the Sprint case does not include the but only to the extent language that the Court found particularly relevant in the Amador case. The argument of public citizen and Connecticut is that you don't need that type of but only proviso. Rather, the general rule that all rates shall be just and reasonable somehow provides that affirmative responsibility of the agency to act. And my answer to that is, again, this is very, very much like the Sprint case. And I should point out that the forbearance requirements in Sprint 47 U.S.C., Section 160, little c, makes reference back to subsection a and allows forbearance of regulatory responsibilities only if forbearance continues to ensure that carrier rates remain just and reasonable and not unduly discriminatory or preferential. So what's important to keep in mind is the agency has responsibilities in all of the subsections of Section 205, 16 U.S.C., 824DD. And, yes, the general rule, the general responsibility of my agency is to ensure that all rates shall be just and reasonable. That is a responsibility that my commissioners very much tried to carry out in the notices, the non-orders that are on review in this particular case. But the agency's responsibilities in carrying out its general responsibilities under subsection a, just and reasonable rates, and subsection b, rates that are not unduly discriminatory or preferential, are, of course, found, the particular responsibilities are found in subsections c, d, and e. And as the courts have found repeatedly, including cases brought by public citizen and the state of Connecticut, that the agency's responsibilities under c, d, and e are discretionary. The statute provides for flexibility. And there is no particularized, concrete, or discrete responsibility of the agency that, if not carried out, would represent a failure to act, which is reviewable under the Administrative Procedure Act. How regular an occurrence is it that the agency allows proposed rates to go into effect by operation of law without taking any action? This is extremely rare, Your Honor. The Federal Power Act and the provisions that we are discussing have been on the books for 80 years. When my general counsel testified before the House hearing, considering the Fair Rates Act that would amend the statute, he testified that he was only able to find six instances over 80 years where the agency allowed a rate filing to go into effect. And I think the statements themselves, while they do not speak for the commission as an institutional body, certainly demonstrate that the agency tried very, very hard to make a decision as to the justness and reasonableness of the Eighth Forward Capacity Option filing, just simply couldn't do so. The petitioners argue that that is extremely unfair to not take a definitive action and not issue a definitive order and to allow the rates to go into effect by operation of law. But if there is any unfairness, that is unfairness that is baked into the statutory scheme. Subsections C, D, and E provide for significant discretion and flexibility. Subsection C concerning the filing of rate schedules provides that under such rules and regulations as the commission may prescribe within such time and in such form as the commission may designate, Subsection D concerning the notice required for rate changes starts with unless the commission orders, no rate change shall go into effect without 60 days prior notice. The commission, for good cause shown, may allow the rates to go into effect with less than 60 days notice. Subsection E concerning the suspension of rates or the conduct of hearings say that the commission has the authority to hold a hearing. The commission may suspend a rate. The commission may order refunds. That is why we submitted the Anglers Conservation Network case after petitioners presented the Excel case. The Excel case cited by Mr. Nelson really has little to do with this case because in that case the commission had made a finding by a majority vote that the rates may not be just and reasonable but then didn't take any additional action to protect consumers. The Anglers case shows that there are statutes that might provide for a combination of shalls and mays, but where we have this type of discretionary authority under C, D, and E, that demonstrates that there's no particular action, no particular method of analysis that the commission need undertake in any one particular case. And I could go on and discuss the merits, but unless you all want me to continue further, I will sit down. All right. Thank you, Mr. Sullivan. Thank you. May it please the Court, Paul Mazzina for the interveners. In the time I have, I'd just like to step back and amplify a couple of points that I think are sufficient to resolve the case. As Judge Brown's first question suggested, by operation of law, these auction results took effect without any action by the commission at the end of the 60-day notice period. So the only question that could possibly be before the Court is whether the commission had a clear, unequivocal, nondiscretionary statutory obligation to take some discreet action during that 60-day period that would have prevented the rates from going into effect. It didn't, and I think it didn't for two related reasons. First, under the Federal Power Act, the commission has no obligation to investigate whether any rate is just and reasonable before the rate takes effect. And second, the commission especially doesn't have that obligation, when what we're talking about are prices that are produced as a result of following a set of market rules that the commission has already approved as just and reasonable. On the first point, Your Honor, it's true that the Federal Power Act says that rates that are not just and reasonable are unlawful, but it also clearly lets rates take effect under 205 and be reviewed later under Section 206 for whether they're just and reasonable. Both the Supreme Court's decision in Morgan Stanley and the commission's own Rule 35.4 make very clear that a rate can take effect under 205, and the fact that the rate is allowed to take effect does not necessarily mean that it's just and reasonable. So that fundamentally distinguishes this case from a case like Amador County, where the statute limited the extent to which something could happen by operation of law. Here, there's no similar limitation on whether rates can take effect. And I think the reason there is that Congress designed the Federal Power Act to tilt toward private arrangements and deregulation. As the Supreme Court said in Ottertail, Congress chose voluntary arrangements over pervasive regulation. It could have required every rate to be pre-approved by the commission or every challenged rate. It didn't. It said after 60 days, they'd take effect automatically. And the second point, and I think this also ties into Amador, Your Honors. In Amador, there was a clear legal standard that the court could apply without needing any agency reasoning. Here, by contrast, the commission has wide discretion to decide what just and reasonable review consists of, when what you're reviewing are prices that are set based on market rules the commission has already approved as just and reasonable. It can even decide, and the Ninth Circuit held this in the Montana Consumer Council case, the commission even has discretion to decide that the market rules themselves are the rate and the prices that result from those rules don't have to be filed under 205 at all. So I think it can certainly decide that where the market rules are followed, as they certainly were here, nobody disputed that, the resulting prices are presumptively just and reasonable under 205. That's the view that's supported by commission precedent. Chair Loeffler helpfully collected that precedent on page 117 of the joint appendix, note 6. It's also supported by policy. It would be incredibly disruptive for the commission to come in after the fact and change these rules when people have already participated in the auction. And so, Your Honors, I think that broad... Well, can I just ask you one question, because it puzzled me, and that is that there is this settlement here, and the settlement says the commission, you know, will review under 205, I guess. So why is that in the settlement if the, you know, it is the case that just the fact of the auction being conducted consistently with the rules is sufficient? Your Honor, the settlement provides for submission and review under 205, but it doesn't take any of the commission's discretion away to decide what that review consists of. And the commission consistently, in that precedent I mentioned, has said that it's just a reasonable review consists of making sure that the market rules the commission had already approved were followed. That's the point of the submission. And, again, you know, there's no reviewable order here, so the commission doesn't have any reason to review. But I think the broad discretion the commission has in this area just underscores that there is no unequivocal statutory obligation to take a discrete action, which is the only way that there could be anything reviewable here. So to, I guess, follow up on Jeff Brown's question, suppose the commissioners issued the notice, the commission issued the notice, and there were statements, and all four commissioners said, we've got some real questions about whether this is just and reasonable. We're inclined to think it's not, but we're going to wait and deal with this under 206 instead of now. Same result? Your Honor, I think if they said that in an order, the commission issued an order saying we're going to decline to review under 205, even though we have concerns, we're going to review under 206 instead. I think there would be a close question under cases like Southern Railway, which Judge Konevassen referred to, as to whether that was a final order of the commission. Assuming it was, I think you could review it under the APA's arbitrary and capricious standard. If the reasons the commission gave were arbitrary or rested on misunderstanding of the law, you could potentially remand. That's what happened in the Batavia case. But it's worth emphasizing that in Batavia, when the court remanded the commission, it still emphasized that on remand the commission would retain broad discretion to decide whether to institute a proceeding under 205. So I think what Your Honor's question points to is the difference between reviewing an actual order where there's some commission reasoning you might be able to say is arbitrary and reviewing inaction, where the only question is, did the commission have a clear nondiscretionary obligation? There was an order in Batavia, as I understand it. There was in Batavia. There was in every case of the petitioner's site for that proposition, Batavia, Cajun, all of those cases involved final orders that were reviewable under the APA standard. Thank you, Your Honor. Thank you, Mr. Medina. Okay, everybody was out of time. So, Mr. Nelson, I'll give you back two minutes and Mr. Wright one minute. Thank you, Your Honor. I want to start just where the interveners ended. The proposition being advanced is that the commission has taken the view and the courts have taken the view that the tariff, the market mechanism, is the rate. That's actually precisely the opposite of what the Ninth Circuit held in Montana Consumer Council and later in Harris. The court said they're not exempt from filing the actual rates under 205 because the actual rate is the rate that gets paid. It's not the tariff that establishes the market mechanism. I think the fundamental issue here really is, does Section 205 actually impose an obligation on the commission to make a determination with respect to whether a challenge rate is lawful before letting it go into effect? Judge Wilkins, your hypothetical question, I think the hypothetical was, as I understood it, intended to be like Excel but without an order, just with statements of the commissioners. I think Excel would imply that if the commission, instead of doing what the commission did in Excel, which was issue an order saying, we think this may be unlawful, but then seemingly forgetting to suspend it, if they just did nothing but they all issued separate statements saying, we think this was unlawful but we're letting it go to 206, I think the agency there would have failed to act in the manner required by Section 205 and it would be reviewable. Again, this is not a circumstance where the agency has simply no obligation. Section 205 is very clear that the rate cannot be unjust and unreasonable, and it does provide for rates going into effect when there's no order setting them aside, but it doesn't purport to excuse the commission from making a determination. It's very revealing, as Mr. Solomon said, that the commission's practice is not just to do nothing and let rates go into effect. Throughout the history of the FPA, it's been understood that the commission has this obligation. Can I just add on Nextel? Nextel does say, in order that commissioners' individual statements accompany the press release reviewable, their statements are not institutional commission actions. So in the hypothetical in which the body takes no action but then individual constituent members release statements. Well, in that case, I agree the statements are not the action. The action is the commission as a body allowing the rates to go into effect and terminating any further. So the action is the inaction, but then in order to understand the reasons for the inaction, one can look to the statements. Right, and in Sprint, the court didn't look at those reasons because it concluded that there was no action for the reasons that, as I've explained, under Amador don't apply. Thank you. Thank you. Thank you, very briefly. I'd like to address the issue of discretion raised by the interveners, and the FERC raises, too, in their brief that they don't have an affirmative obligation to go forward and investigate the rates. They cited Morgan Stanley in the Code of Federal Regulations. This is wrong. We agree that FERC has discretion to let a rate go into effect prior to it's reviewed for its lawfulness, and we agree that it doesn't have to necessarily mean an approval of the rate, but the general principle that FERC exercises discretion in the application of all of its duties does not mean it performs those duties arbitrarily or unreasonably, and that's the case here. We know already that these rates were subject to the influence of market power. We know that from ISO. We know that from FERC's enforcement unit itself. We know that from interveners and protesters, us and public citizen, and from two commissioners that have issued public statements. This is not a case where FERC should have been allowed to let the rates go into effect. There was more than a material issue of fact, a requirement to hold a hearing. Thank you. Thank you very much.
judges: Brown, Srinivasan, Wilkins